UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
CHENG KANG SHI,

                              Petitioner,                                    REPORT AND
                                                                             RECOMMENDATION
                     -against-

WILLIAM PHILLIPS,                                                            06-CV-2093 (NG)

                              Respondent.
-------------------------------------------------------------------x

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

        In his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, petitioner

Cheng Kang Shi ("petitioner" or "Shi")[1] seeks relief from the sentence imposed upon him as a

consequence of his conviction in New York State Supreme Court, Queens County.  Petitioner

challenges the sufficiency of the evidence; the trial court's jury charge; the prosecutor's

comments; and his trial attorney's effectiveness.  The petition was referred to the undersigned

magistrate judge by the Honorable Nina Gershon for a Report and Recommendation.  For the

reasons that follow, this Court recommends that the petition be denied and the case be

dismissed.

## FACTUAL BACKGROUND

**I.      Trial and Sentence**

        In October and November 2002, petitioner, along with his son, Yu Feng Shi ("Yu

Feng" or "co-defendant Yu Feng"), and a third defendant – Yu Feng's friend, Zi Huang Wang

_____

[1]  Shi originally filed his petition *pro se*.  On February 13, 2007, after the matter was fully
submitted, Joel S. Cohen, Esq., filed a notice of appearance on his behalf, and subsequently
supplemented Shi's *pro se* submissions.

("co-defendant Wang") – went to trial before Justice Joseph Rosenzweig and a jury, on charges stemming from an assault upon Yeong Hoo Fu ("Fu" or "victim Fu") on February 14, 2001. The prosecution's witnesses included victim Fu and two eyewitnesses: Ji Jun Yang ("Yang"), at whose home the assault occurred, and Wen Xing Xu ("Ms. Xu"). Co-defendant Yu Feng (petitioner's son) testified as a defense witness and also called to the stand his mother (petitioner's wife), Ren Lan Zhu ("Mrs. Shi").

### A. The Prosecution's Case

At around 8:30 p.m. on February 14, 2001, Yang held a party in a private room at the East Lake Restaurant in Flushing, Queens. (Trial Transcript ["T."] 507, 570.) Approximately ten people attended Yang's party, including Yang's wife and son; Ms. Xu and her husband; a Dr. Ye ("Dr. Ye") and his wife; and victim Fu. (T. 509, 664-65.) At around 10:00 p.m., petitioner and another man, who were attending a gathering in an adjoining private room, entered Yang's private room and toasted the Yang party attendees. (T. 510-12, 666-67, 848-49.)[2] After conversing with Dr. Ye, petitioner, who had been drinking, rose to demonstrate his Kung Fu techniques. (T. 512-15, 574-76.) While the witnesses had somewhat different recollections as to the precise catalyst of the ensuing dispute, all agreed that petitioner and Fu started arguing, other party attendees had to separate them, and petitioner left Yang's private room with his companion. (T. 515-16, 669-70.)[3] Later, the Yang party attendees heard loud

---

[2] The man accompanying petitioner was from Mainland China and was also a friend of Yang's. (T. 848-49.)

[3] Ms. Xu recalled that Fu told petitioner that it was inappropriate to demonstrate Kung Fu at a birthday party. (T. 515, 575-76.) Fu testified that petitioner had become visibly angry earlier,
(continued…)

crashing noises and shouting coming from petitioner's private room.  (T. 516, 670-71.)

Petitioner's wife, Mrs. Shi, entered Yang's private room and suggested that Yang's party leave

the restaurant.  (T. 516, 671-72.)

At approximately 11:00 p.m., Yang brought his guests to his apartment in Flushing,

Queens.  (T. 517-18, 570, 672-73.)  According to Ms. Xu, Yang went to his bedroom to lie

down, while Dr. Ye, victim Fu and Yang's son went to the son's bedroom to rest.  (T. 525,

581.)  Around 11:30 p.m., Yang's wife answered a knock on the door, and petitioner entered

with his 18-year-old son (co-defendant Yu Feng), co-defendant Wang and a third youth,[4]

followed shortly thereafter by two middle-aged men.  (T. 525-26, 631-32, 635.)  Petitioner

entered Yang's bedroom and talked loudly to Yang for about ten minutes, while petitioner's

companions remained in the living room with Yang's guests.  (T. 527, 635.)[5]  After Dr. Ye

briefly entered Yang's bedroom and told petitioner not to argue, (T. 527), Yang tried to calm

petitioner down, but petitioner said that he had been humiliated at the restaurant.  (T. 862-63.)

---

[3](…continued)
while talking with Dr. Ye about Kung Fu mentors; in order to calm petitioner down, Fu suggested that he and petitioner arm wrestle and then declared petitioner the winner before they had even started.  (T. 668-70.)  According to Fu, petitioner then assumed a Kung Fu stance and pushed Fu.  (T. 670)

[4]  According to the testimony of co-defendant Yu Feng, the third youth was his cousin, petitioner's nephew.  (T. 1280.)

[5]  Fu had a somewhat different recollection of the movements of the various individuals; he claimed that he sat with all of the other guests in the living room until petitioner arrived with his group, at which point petitioner went to Yang's bedroom, petitioner's group went in and out of that bedroom, and victim Fu, Dr. Ye and another guest went to Yang's son's bedroom.  (T. 674-76, 735-36.)  Yang similarly recalled that petitioner entered his bedroom with the three youths, who left that room when Yang said he wanted to talk to petitioner.  (T. 892-93.)

While petitioner was in Yang's bedroom, many of Yang's guests left the party, leaving only Ms. Xu, Dr. Ye, and two other guests, along with petitioner and the five other individuals from petitioner's group. (T. 528-30.)

Approximately twenty minutes later, victim Fu left Yang's son's room and answered a knock at the door of Yang's apartment. (T. 677, 828-29.) Mrs. Shi was at the door, and asked to speak to her husband. (T. 533, 679, 828.) Fu refused to let her enter, and shut the door. (T. 679-81.) Mrs. Shi started screaming that her hand had been hurt. (T. 536.) Co-defendants Yu Feng and Wang, along with the third youth in their group, then attacked Fu. (T. 536-37.) The three young men punched Fu's face and head until he fell, then proceeded to kick his chest, head and face. (T. 537.) According to Ms. Xu's account, as victim Fu got up from the floor, petitioner emerged from Yang's bedroom and punched Fu once in the chest. (T. 538-39, 602-03.)[6] Meanwhile, at 12:23 p.m., Ms. Xu left the living room and placed a call to 911. (T. 546-47, 635.) Yang brought victim Fu into the kitchen, where, Fu testified, petitioner punched Fu two more times while threatening to kill him. (T. 683-84.)[7]

By the time Ms. Xu returned to the living room after making the 911 call, petitioner and his group had left Yang's apartment. (T. 555.) Yang laid victim Fu on a bed in Yang's son's bedroom. (T. 604, 685, 881.) Fu had visible injuries and was bleeding, but refused Ms.

---

[6] Yang testified that petitioner punched Fu while Yang was trying to separate co-defendants Yu Feng and Wang from Fu. (T. 863-64, 881.)

[7] Yang recalled that after petitioner punched Fu once in the chest, Yang brought Fu to the son's bedroom. (T. 864.)

Xu's offer to take him to the hospital. (T. 555.) The police arrived at around midnight, but left after Fu indicated that he did not want to go to the hospital. (T. 604-05, 686.)

The following day, at approximately 5:00 a.m., victim Fu went to the hospital but was told to go home unless his condition worsened. (T. 687-88, 786.) Sometime around 10:00 a.m., petitioner called Yang's house to apologize for punching Fu, but Yang told petitioner that it was up to Fu to forgive petitioner. (T. 867.) At 11:00 a.m., victim Fu began to experience shortness of breath. (T. 700, 790.) At approximately 2:00 p.m., Emergency Medical Technician Richard Erdey, acting in response to an emergency phone call, transported Fu to Booth Memorial, New York Medical Center. (T. 484-86, 490.) Fu had contusions on his face and was babbling incoherently. (T. 488.) Fu fell into a deep coma by the time he reached the hospital. (T. 1023.) Dr. James Maurer, one of Fu's treating surgeons, concluded that his coma was caused by a pulmonary contusion incurred as a result of blunt force trauma to his lung, in addition to a bruise on his heart and a clot in his jugular vein. (T. 1036-40.) Victim Fu remained in the intensive care unit until he regained consciousness twenty days later. (T. 701, 1014.) He suffered permanent injuries such as damage to his inner ear, weakness, and shortness of breath when walking long distances. (T. 711-13.)

**B.    The Defense Case**

Mrs. Shi, who was called to the stand by co-defendant Yu Feng (the son of Mrs. Shi and petitioner), testified that on the evening of February 14, 2001, she was at the restaurant with petitioner and others, for a going-away party for their friend Tin Tse Hom ("Hom"), who was returning to China. (T. 1185-86.) Victim Fu and Yang entered petitioner's private room to make a toast. (T. 1186-87; see T. 1188-89, 1191-92.) Petitioner and Hom later went to the

adjoining room to return the favor and make a toast in response.  (T. 1187-88.)  Hearing loud voices, Mrs. Shi went to the next room, where she saw Fu and someone else threatening to strike petitioner.  (T. 1188, 1214.)  Several of the people from the adjoining room followed Mrs. Shi and petitioner back to their private room, but left the restaurant after Mrs. Shi asked them not to enter.  (T. 1189-90, 1221-22.)

After paying the bill, Mrs. Shi was unable to locate petitioner, so she and Hom headed towards her home.  (T. 1191, 1227-29.)  Outside her house, she encountered an acquaintance named Zi Men Wong ("Men Wong"), who was looking for petitioner.  (T. 1191-93.)  As petitioner was not home, Men Wong drove Mrs. Shi to Yang's apartment and told her to wait while he went inside.  (T. 1191-92.)  Mrs. Shi remained in the car until the alarm went off.  (T. 1193-94.)  She then left the car and went to Yang's apartment to try to retrieve the car key.  (T. 1194.)  Victim Fu opened the door in response to her knock, but then slammed the door on her hand when she was halfway through the door.  (T. 1194-99.)  Mrs. Shi screamed for help, then ran outside and took a cab home.  (T. 1199-1201.)

Co-defendant Yu Feng also testified as a defense witness.  He stated that on the date of the incident, he received a phone call from petitioner at approximately 11:00 p.m., asking him to come to the restaurant.  (T. 1272-73.)  Co-defendant Wang picked Yu Feng up but by the time they reached the restaurant, petitioner had already left.  (T. 1273-74.)  Co-defendant Yu Feng then used his cell phone to call petitioner, who told him to come to Yang's apartment.  (T. 1274.)  Yu Feng entered the apartment while co-defendant Wang waited in the car.  (T. 1274, 1332.)

Inside the apartment, co-defendant Yu Feng saw his father arguing with victim Fu, Ms. Xu, Yang, and others in the living room. (T. 1275-77, 1332-33.) Yang brought petitioner and co-defendant Yu Feng into another room, where petitioner lay down on the bed. (T. 1279-80.) Later, co-defendant Yu Feng returned to the living room and saw his cousin Dring Shi Chong (petitioner's nephew) enter the apartment with co-defendant Wang. (T. 1280.) Soon thereafter, Yu Feng observed his mother at the door and told her to go home. (T. 1282.) As he was about to ask his father to leave, Yu Feng heard Mrs. Shi screaming and saw victim Fu pushing the door shut. (T. 1283.) Yu Feng tried to pull Fu's hand away from the door, but Fu continued to hold the door shut and pushed Yu Feng away with his other hand. (T. 1286-87.) Yu Feng punched Fu twice, then wrestled him to the ground. (T. 1288-89.) Yu Feng continued to punch Fu while they were wrestling, until co-defendant Wang and Yang's guests separated the two. (T. 1290-92.) After they were separated, petitioner and Yang emerged from the other room. (T. 1292.) Co-defendant Yu Feng then left the apartment to look for his mother. (T. 1292.)

## C.    The Verdict and Sentence

The jury found petitioner and his two co-defendants guilty of one count of Gang Assault in the First Degree, one count of Gang Assault in the Second Degree, one count of Assault in the Second Degree, and one count of Assault in the Third Degree. (T. 1679-86.)[8] On March 3, 2003, Shi was sentenced to concurrent prison terms of seven years for Gang Assault in the

---

[8] All three defendants were acquitted of Assault in the First Degree (T. 1679-86), a charge that would have required the jury to find, among other things, "circumstances evincing a depraved indifference to human life" and conduct that "create[d] a grave risk of death to another person." N.Y. Penal Law § 120.10(3).

First Degree, three and one-half years for Gang Assault in the Second Degree and Assault in the Second Degree, and one year for Assault in the Third Degree, to be followed by a five-year period of post-release supervision.  See Brief for Defendants-Appellants [on Direct Appeal], People v. Shi, 2003-2401 & 2003-2069, dated Feb. 4, 2004 ("Pet. App. Br."), at 1-2.

## II.     Post-Conviction Proceedings

Petitioner appealed his conviction to the New York Supreme Court, Appellate Division, Second Department ("Appellate Division"), arguing that (1) the evidence was insufficient to prove his guilt under an accessorial liability theory on the felony assault counts or to establish his intent to cause serious physical injury;[9] (2) the trial court's accessorial liability instructions to the jury on the gang assault counts were erroneous; (3) the prosecutor's comments during the trial deprived him of a fair trial; and (4) his sentence was harsh and excessive.  See Pet. App. Br. at 2-3.

In a decision dated November 15, 2004, the Appellate Division unanimously affirmed petitioner's judgment of conviction.  People v. Cheng Kang Shi, 783 N.Y.S.2d 877 (2d Dep't 2004).  The Appellate Division held that (1) the evidence was "legally sufficient to establish the defendant's guilt beyond a reasonable doubt;" (2) "[t]he sentence imposed was not excessive;" and (3) petitioner's "remaining contentions either are unpreserved for appellate review or without merit."  Id.

By letter dated December 10, 2004, petitioner sought leave to appeal to the New York

---

[9] Petitioner did not challenge his conviction for Assault in the Third Degree (N.Y. Penal Law § 120.00), a misdemeanor.

Court of Appeals. On March 18, 2005, petitioner's application was denied. People v. Cheng Kang Shi, 796 N.Y.S.2d 584 (table) (2005).

On June 6, 2005, petitioner, represented by new counsel, filed a motion to vacate the judgment pursuant to section 440.10 of New York's Criminal Procedure Law, claiming that he had received ineffective assistance of trial counsel. See Memorandum of Law in Support of Defendant Cheng Kang Shi's Motion to Vacate the Judgments Against Him ("Pet. 440.10 Mem."). Specifically, petitioner alleged that his trial counsel, Richard Spivack ("Spivack"), conducted an inadequate investigation and failed to call three witnesses who would have provided exculpatory testimony at trial. See id. at 8-18. In addition, petitioner alleged that Spivack did not discuss trial strategy with or convey plea offers to him. See id. at 18-20. Justice Seymour Rotker of the Supreme Court, Criminal Term, denied the motion, finding "unpersuasive" petitioner's claim that Spivack failed to discuss trial strategy and convey a plea offer to him, and concluding that petitioner's challenge to Spivack's investigation of the case was procedurally barred and otherwise without merit. See People v. Cheng Kang Shi, Order on Motion: To Vacate Judgment of Conviction [P]ursuant to CPL 440.10, Indictment No.: 582-01 (N.Y. Crim. Term Aug. 25, 2005) ("440.10 Opinion"), at 4-11. The Appellate Division denied petitioner's *pro se* application for a certificate granting leave to appeal the denial of his 440.10 motion. People v. Cheng Kang Shi, Decision & Order on Application, 2005-09707, Ind. No [582]/01 (2d Dep't Dec. 6, 2005).

Proceeding *pro se*, petitioner timely filed his federal habeas corpus petition in the United States District Court for the Southern District of New York on March 20, 2006. See Petition dated 3/16/06 ("Petition"). By order of Chief Judge Michael B. Mukasey, dated April

25, 2006, the petition was transferred to this district.  <u>See</u> Transfer Order dated 4/25/06.  On

May 11, 2006, Judge Gershon referred the petition to this Magistrate Judge for a Report and

Recommendation.  5/11/06 Order.  Respondent subsequently filed its Affidavit and

Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus ("DA Mem.").

While the petition was pending before this Court, petitioner retained an attorney, who

sought and was afforded a lengthy period of time to supplement Shi's *pro se* filings.

Petitioner, through counsel, filed his supplemental brief on May 17, 2007.  <u>See</u> Supplemental

Memorandum in Support of the Previously Submitted Petition by Chen[g] Kang Shi Pursuant

to 28 U.S.C. 2254 ("Pet. Supp. Mem.").  Respondent supplemented its submissions on June

13, 2007.  <u>See</u> Supplemental Memorandum of Law ("DA Supp. Mem."), appended to

Supplemental Affidavit in Opposition to Petition for a Writ of *Habeas Corpus*.

As he did on his direct appeal, petitioner again challenges the sufficiency of the

evidence on the felony counts; the trial court's jury charge on the gang assault counts; and the

fairness of the prosecutor's comments to the jury.  <u>See</u> Petition at 5-6; Pet. Supp. Mem. at 10-

19.  Petitioner also alleges that he was denied his right to effective assistance of trial counsel.

<u>See</u> Petition at 6; Pet. Supp. Mem. at 20-30.

## FEDERAL HABEAS REVIEW OF STATE COURT DECISIONS

The adjudication of Shi's petition for habeas corpus relief is governed by the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which amended the

federal statute under which he seeks habeas relief, 28 U.S.C. § 2254.  AEDPA established a

deferential standard that federal habeas courts must apply in reviewing state court convictions.

Under AEDPA, a federal court may grant habeas relief with respect to a federal claim

adjudicated on the merits in state court only if that adjudication was "(1) . . . contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Bell v. Cone, 535 U.S. 685, 693-94 (2002); Williams v. Taylor, 529 U.S. 362, 404-05 (2000).

"The threshold inquiry is whether the petitioner seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002) (quoting Williams, 529 U.S. at 390) (internal quotation marks omitted). A law is clearly established if it has been enunciated in the holding – as opposed to dicta – of a Supreme Court decision, whether as a generalized standard "or a bright-line rule designed to effectuate such a standard in a particular context." Id.; see also Williams, 529 U.S. at 412.

A state court decision is "contrary to" Supreme Court precedent if the court "applies a rule that contradicts the governing law," or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless" arrives at a different result. Williams, 529 U.S. at 405-06.

A decision involves an "unreasonable application" of Supreme Court precedent if the state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or if it "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it

11

should apply." Id. at 407. The relevant inquiry under AEDPA "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." Schriro v. Landrigan, ___ U.S. ___, 127 S.Ct. 1933, 1939 (May 14, 2007); see also Williams, 529 U.S. at 410 ("[A] federal habeas court should ask whether the state court's application of clearly established federal law was objectively unreasonable.").

With respect to AEDPA's second prong, a state court's factual determinations are presumed to be correct. 28 U.S.C. § 2254(e)(1). Such determinations are unreasonable only where the petitioner rebuts the presumption of correctness "by clear and convincing evidence." Id.; see Landrigan, 127 S.Ct. at 1939-40.

By its terms, AEDPA's deferential standard of review applies only to federal claims adjudicated on the merits. An adjudication is on the merits if it was "a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001). However, AEDPA does not require an explanation of the state court's reasoning process for a decision to qualify as an adjudication on the merits. Id. at 311-12. Furthermore, AEDPA's deferential standard of review applies even if the state court did not "explicitly refer to either the federal claim or to relevant federal case law." Id. at 312. As long as the state court "dispose[d] of the petitioner's federal claim on substantive grounds, and reduce[d] that disposition to judgment[, n]o further articulation of its rationale or elucidation of its reasoning process is required." Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001); accord Early v. Packer, 537 U.S. 3, 8 (2002) (state court not required to cite Supreme Court cases, or

even be aware of them, to be entitled to AEDPA deference, "so long as neither the reasoning nor the result of the state-court decision contradicts them"); James v. Artus, No. 03-CV-7612 (AJP), 2005 WL 859245, at *7 (S.D.N.Y. Apr. 15, 2005) ("Even where the state court decision does not specifically refer to either the federal claim or to relevant case law, the deferential AEDPA review standard applies[.]").  Where, as here, a state court rejects a petitioner's claim as either unpreserved or without merit, "the conclusive presumption is that the adjudication rested on the merits," and the habeas court owes AEDPA deference to that adjudication.  See Hawkins v. Costello, 460 F.3d 238, 242 (2d Cir. 2006) (citing Jimenez v. Walker, 458 F.3d 130, 146 (2d Cir. 2006)).

## PETITIONER'S CLAIMS

### I.    Sufficiency of the Evidence

A petitioner challenging the sufficiency of the evidence bears a very heavy burden.  See Knapp v. Leonardo, 46 F.3d 170, 178 (2d Cir. 1995).  Petitioner's claim that the evidence failed to establish either his culpability as an accessory to a felony assault or his intent to cause serious injury cannot be sustained unless, after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979).  "This standard recognizes that it is 'the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'  Where the record supports conflicting inferences, the court 'must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'"  Alvarez v. Conway, No. 05-CV-3235 (NRB), 2005 WL 3434634, at *5

13

(S.D.N.Y. Dec. 13, 2005) (quoting <u>Jackson</u>, 443 U.S. at 319, 326). "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 318-19 (emphasis in original) (citing <u>Woodby v. INS</u>, 385 U.S. 276, 282 (1966)) (internal quotation marks omitted).

Petitioner argues that the evidence presented at trial did not establish that his attack on Fu was "aided by two or more other persons actually present," as required by the two gang assault charges, or that he was aiding and abetting his co-defendants, as required by the second-degree assault charge. <u>See</u> Petition at 5; Pet. Supp. Mem. at 10-16. Petitioner also argues in his *pro se* submission that the evidence did not establish his intent to cause serious physical injury, as required by the second-degree gang assault and second-degree assault charges. <u>See</u> Petition at 5. However, as the evidence in the record easily satisfies the *Jackson* standard, the Appellate Division did not act unreasonably in concluding that the proof was legally sufficient to establish petitioner's guilt beyond a reasonable doubt. <u>Cheng Kang Shi</u>, 783 N.Y.S.2d at 877.

When a federal habeas court considers a sufficiency claim, it must look to state law to determine the elements of the offense. <u>See</u> <u>Quartararo v. Hanslmaier</u>, 186 F.3d 91, 97 (2d Cir. 1999). Under New York law, a person is guilty of gang assault in the first degree "when, with intent to cause serious physical injury to another person and when aided by two or more

14

other persons actually present, he causes serious physical injury to such person or to a third person." N.Y. Penal Law § 120.07. Gang assault in the second degree requires intent to cause physical injury (as opposed to *serious* physical injury), and is otherwise identical. <u>See</u> <u>id.</u> § 120.06. A person is guilty of assault in the second degree when, "[w]ith intent to cause serious physical injury to another person, he causes such injury to such person or to a third person." <u>Id.</u> § 120.05(1).

With respect to both gang assault in the first degree and assault in the second degree, "'[s]erious physical injury' means physical injury which creates a substantial risk of death, or which causes . . . protracted impairment of health or protracted loss or impairment of the function of any bodily organ." <u>Id.</u> § 10.00(11). "'Aided' means assisted, supported or helped." <u>See</u> 1 Charges to Jury & Requests to Charge in Crim. Case in N.Y. § 10:41 (Gang assault – Second degree). Thus, with respect to the "aiding" or acting in concert element, an accused may be held responsible for the conduct of another "when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct." N.Y. Penal Law § 20.00.

## A. Accessorial Liability

In his closing statement to the jury, petitioner's counsel argued at length that Fu was beaten in two entirely independent events, with petitioner acting alone, in a spontaneous reaction to his wife's screams, following the conclusion of the first assault. (T. 1430-37, 1446-47.) Petitioner now seeks to relitigate those factual issues, which the jury resolved against him.

The jury's verdict was supported by the evidence at trial. The jury heard testimony that after enlisting assistance from his son (co-defendant Yu Feng), petitioner, who was angry at

15

victim Fu, went uninvited to Yang's apartment, late at night, to demand an apology. (T. 526-27, 860-63.) Petitioner subsequently emerged from Yang's bedroom while his two co-defendants and a third youth were beating victim Fu, and petitioner thereupon delivered at least one punch to Fu's chest. (T. 538-39.) Petitioner's son confirmed in his testimony that he went to the Yang apartment, along with co-defendant Wang, at petitioner's request, (T. 1274), and that he hit the victim while petitioner was in the room. (T. 1331.) Based on this evidence, a rational jury faced with the felony assault charges could have found beyond a reasonable doubt that the altercation was one ongoing event, and not two distinct events, and that petitioner was aiding and acting in concert with two or more other persons actually present when he punched petitioner. Even assuming *arguendo* that, as petitioner contends, some evidence can be read to suggest that petitioner "committed a separate, successive assault upon the victim *after* the assault by the group had been completed," Petition at 5; <u>see</u> Pet. Supp. Mem. at 14, the resolution of any competing inferences was within the province of the jury. <u>See</u> <u>Jackson</u>, 443 U.S. at 326 ("[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.").[10]

---

[10] Furthermore, with respect to the second-degree assault charge, the evidence of a conflict between petitioner and Fu earlier in the evening, coupled with the uncontested testimony that petitioner asked his son to come to Yang's apartment, could have led a rational jury to conclude that petitioner's invitation constituted a solicitation, request or command to engage in the initial assault, within the meaning of the accessorial liability statute. <u>See</u> N.Y. Penal Law § 20.00.

## B.    Intent to Cause Serious Physical Injury

Similarly without merit is petitioner's argument in his *pro se* petition that the evidence was "legally and factually insufficient to prove that [he] possessed intent to cause serious physical injury." Petition at 5. Through the testimony of one of victim Fu's surgeons, the prosecution presented evidence detailing the extent of Fu's injuries giving rise to Fu's coma, including a pulmonary contusion caused by, *inter alia*, blunt force trauma to the chest. (T. 1036-39.) Three witnesses testified that they saw petitioner hit Fu in the chest.[11] Additionally, Fu testified that petitioner threatened to kill him. (T. 684.) It was thus reasonable for the jury to infer that petitioner intended to cause serious physical injury, especially given petitioner's awareness, at the time of the punch, of Fu's weakened physical condition following a brutal beating that caused him to fall to the floor. See People v. Stoby, 771 N.Y.S.2d 623, 625 (4th Dep't 2004) ("Intent [to cause serious physical injury] may be inferred from defendant's conduct and the surrounding circumstances.") (internal quotation marks and citation omitted); see also In re Gregory B., 661 N.Y.S.2d 656, 657 (2d Dep't 1997) (intent to cause injury may be inferred from the totality of defendant's conduct, coupled with the quantity and severity of the injuries).[12]

---

[11]  In addition to the victim's testimony, both Yang and Xu stated that they saw petitioner hit Fu. (T. 538-39, 603, 881.)

[12]  Petitioner contends that, according to the medical testimony at trial, one or two punches to the chest "could not have caused" Fu's serious injuries "or even [have] contribute[d] to those injuries." Pet. Supp. Mem. at 7; see id. at 12; Petition at 5. In fact, while Fu's treating physician acknowledged that Fu's various injuries were likely caused by numerous blows to his

(continued…)

Accordingly, the record contains sufficient evidence to support the jury's finding of guilt beyond a reasonable doubt on the felony assault charges. The state court thus did not act unreasonably in rejecting petitioner's challenge to the sufficiency of the evidence. To the extent that petitioner's argument focuses on the quality, and not the quantity, of the evidence, petitioner's claim is not cognizable on federal habeas review as it does not raise a constitutional issue. See Correa v. Duncan, 172 F.Supp.2d 378, 381 (E.D.N.Y. 2001).

## II. Adequacy of Jury Instructions

Petitioner additionally claims that the trial court's instructions on accessorial conduct "permitted the jury to convict [on the gang assault charges] on the impermissible theory that [petitioner] was one of the 'two or more persons actually present' when the first assault was committed." Petition at 5; see Pet. Supp. Mem. at 14-15. Petitioner's theory is, in essence, that because the prosecution could not establish that he participated in the initial beating with his co-defendants, the prosecution could establish his culpability only as an aider and abettor, which would require the jury to

---

[12](...continued)
chest and neck, (T. 1085-86, 1090-91, 1094), nothing in the record supports petitioner's claim that the blows landed by petitioner did not "contribute" to those injuries.

The medical evidence thus is not inconsistent with the jury's verdict. As previously noted, the proof at trial supported a determination that petitioner acted in concert with his co-defendants, who had already subjected Fu to a brutal beating. Furthermore, the jury heard evidence that petitioner was a practitioner of Kung Fu, (T. 512, 668), as well as medical testimony that Fu's injuries were caused by blunt force trauma. (T. 1036.) The jury was entitled to construe this evidence against petitioner.

first conclude that the elements of the gang assault statutes had been satisfied as to petitioner's co-defendants and the third youth.  <u>See</u> Pet. App. Br. at 45-46.

## A.    Factual Background

The trial court instructed the jury at length on the issue of the statutory requirements for accessorial liability on the two gang assault charges.  In explaining the statutory element of "aid[] by two or more other persons actually present" (N.Y. Penal Law § 120.07), the court stated that "[a] person is actually present when such person is in a position to render immediate assistance to a person participating in the assault, and is ready, willing, and able to do so."  (T. 1580-81.)  Further, in explaining each of the two gang assault charges, the court noted that the prosecution was required to prove beyond a reasonable doubt that the defendant under consideration, while acting with the requisite intent and while "aiding the others and acting in concert with another person, caused serious physical injury to . . . Fu" and that "each defendant was aided by two or more persons actually present."  (T. 1581-83.)[13]  The court also provided a more general charge on acting in concert, explaining that a person may be criminally liable for the conduct of another "when acting with the state of mind required for the commission of the offense, he solicits, requests, commands, importunes, or intentionally aid[s] such person to engage in such conduct."  (T. 1588-89.)  The court cautioned the jurors that "mere presence at the scene of the crime, even with knowledge that the crime is taking

---

[13]  The court correctly instructed the jury that gang assault in the first degree required serious physical injury and intent to commit the same, (T. 1580-82), whereas gang assault in the second degree required serious physical injury and intent to cause physical injury.  (T. 1582.)

place, or mere association with a perpetrator of a crime, does not by itself make a defendant criminally liable for that crime." (T. 1589.)

Immediately after the court delivered its charge, petitioner's counsel requested supplemental instructions regarding the "acting in concert" charge. Specifically, petitioner argued that because the court "initially read the various elements of the offenses, and then toward the end read the charge on acting in concert," the jury might not have understood that "acting in concert" was an element of the offenses. (T. 1604-05.) Accordingly, petitioner demanded a "curative instruction" that "acting in concert" was an element of each of the felony offenses. (T. 1605.) Additionally, petitioner requested that the judge instruct the jurors that a finding that Shi was part of a separate incident would not support a conclusion that Shi was acting in concert with the perpetrators of the earlier beating. (T. 1605-06.) The trial court denied petitioner's request for supplemental charges, noting that its charge was consistent with the then current edition of New York's Criminal Jury Instructions. (T. 1606-07.) See CJI2d [NY] Penal Law §§ 120.00, 120.05, 120.06, 120.07.

Thereafter, the jury sent out a note, expressing "confusion as to the definitions of the assault charges with regard to acting in concert." (T. 1612.) In response, the trial court agreed to "grant Mr. Spiva[c]k's previous request, that acting in concert be read to them prior to the elements of the charges." (T. 1612.) The court then recharged the jury on the meaning of acting in concert, (T. 1615-17), followed by a detailed description of the elements of each count, (T. 1617-25), including, as to each, the requirement that the accused "aid[ed] the others and act[ed] in concert with another

20

person." (T. 1618, 1620, 1622, 1624, 1625.)  Dissatisfied, petitioner's attorney requested an additional supplemental charge.  (T. 1626-28.)  The court declined the request, (T. 1628), but expressly advised the jury that, "[a]s to any request you make, if my response does not clarify it enough, send me another note."  (T. 1629.)  The jury sent no further notes on the issue of acting in concert.  On appeal, the Appellate Division rejected without comment petitioner's challenge to the jury instructions.  <u>See</u> <u>Cheng Kang Shi</u>, 783 N.Y.S.2d at 877.

**B.**     **Legal Analysis**

The adequacy of a jury charge is ordinarily a matter of state law.  <u>See</u> <u>Blazic v.</u> <u>Henderson</u>, 900 F.2d 534, 541 (2d Cir. 1990); <u>Taylor v. Kuhlmann</u>, 36 F.Supp.2d 534, 554 (E.D.N.Y. 1999).  An error as to jury instructions is cognizable on habeas review only to the extent that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  <u>Cupp v. Naughten</u>, 414 U.S. 141, 147 (1973).  "[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment."  <u>Id.</u> at 146; <u>accord</u> <u>Middleton v. McNeil</u>, 541 U.S. 433, 437 (2004) ("[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation.").  The reviewing court must apply "the well established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge."  <u>Cupp</u>, 414 U.S. at 146-47.

On habeas review, the petitioner bears the burden of establishing a constitutional violation. See DelValle v. Armstrong, 306 F.3d 1197, 1200 (2d Cir. 2002); Fama v. Comm'r of Corr. Servs., 69 F.Supp.2d 388, 396-97 (E.D.N.Y. 1999) (petitioner failed to show that instruction was erroneous or that any alleged violation rose to the level of a constitutional violation), aff'd, 235 F.3d 804 (2d Cir. 2000). The petitioner's burden becomes even more difficult where, as here, he does not complain about an erroneous instruction, but instead faults the trial court for declining to include a particular instruction in its jury charge. See Henderson v. Kibbe, 431 U.S. 145, 155 (1977) ("An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."); accord Roy v. Coxon, 907 F.2d 385, 391 (2d Cir. 1990).

Petitioner has identified no constitutional violation in the present case. The judge's instructions closely followed New York's Criminal Jury Instructions on Accessorial Liability and on the two Gang Assault charges. See CJI2d [NY] Accessorial Liability, Penal Law §§ 120.05, 120.06. Although petitioner argued in his appellate brief that the trial court refused to give a "curative instruction as to [his] culpability under the gang assault statute[s]," Pet. App. Br. at 45, the trial court did in fact explain that "acting in concert" was an element of both gang assault charges, and twice charged the jury on the definition of "acting in concert." The court's instructions enabled the jury to make all material determinations in this case, including those concerning the issue of accessorial liability. See Turner v. Sullivan, 661 F.Supp. 535, 540 (E.D.N.Y. 1987) (McLaughlin, J.) (rejecting habeas challenge to similar acting-in-concert charge), aff'd, 842 F.2d 1288 (2d Cir. 1988). Consequently, the court's refusal to further

supplement a definition already provided to the jury was not error, let alone one of constitutional magnitude. Accordingly, it cannot be said that the jury charge so infected the entire trial as to warrant habeas relief, and the Appellate Division's rejection of petitioner's claim was not contrary to, or an unreasonable application of, clearly established federal law.[14]

## III. Prosecutor's Statements

Petitioner additionally claims that statements made by the prosecutor to the jury denied him his constitutional right to a fair trial. <u>See</u> Petition at 6; Pet. Supp. Mem. at 16-19. Specifically, petitioner contends that the prosecutor improperly (1) suggested to the jury that petitioner and his co-defendants might retaliate against a witness; (2) denigrated defense counsel by accusing them of dissecting "bits [and] pieces of the evidence;" (3) vouched for the credibility of the prosecution witnesses; and (4) expressed the opinion that co-defendant Yu Feng's testimony was not truthful. Petition at 6; Pet. Supp. Mem. at 16-19. The challenged remarks do not, however, warrant habeas relief.

A writ of habeas corpus will not issue on the basis of prosecutorial misconduct unless such conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986)

---

[14] Furthermore, to the extent that petitioner's challenge to the jury instructions rests on the contention that "the prosecutor could not . . . argue that petitioner was a princip[al] in the commission of the assault or that he was actually present," Petition at 5, that argument is without merit. As discussed *supra*, a reasonable jury could infer that petitioner and his co-defendants subjected Fu to one ongoing assault rather than two separate ones.

(quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)); see also United States v. Young, 470 U.S. 1, 11 (1985) ("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone . . . ."). To prove such unfairness, the habeas petitioner must establish that "the prosecutor's comments constituted more than mere trial error," Tankleff v. Senkowski, 135 F.3d 235, 252 (2d Cir. 1998); he must further show "that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict." Id. (quoting Bentley v. Scully, 41 F.3d 818, 823 (2d Cir. 1994)); accord Kae v. Artuz, No. 98-CV-4711 (FB), 2000 WL 1738339, at *4 (E.D.N.Y. Nov. 21, 2000); Bossett v. Portunado, No. 97-CV-2116 (JBW), 1998 WL 433860, at *3 (E.D.N.Y. July 28, 1998) ("No matter how blameworthy the conduct of the prosecutor, a collateral attack on constitutional grounds is warranted only when the court has reason to believe that the prosecutorial misconduct influenced the jury's verdict.").

As the Second Circuit has observed, it is a rare case in which prosecutorial misconduct will be "so prejudicial that a new trial is required." Floyd v. Meachum, 907 F.2d 347, 348 (2d Cir. 1990); see United States v. Newton, 369 F.3d 659, 680 (2d Cir. 2004) (noting the heavy burden imposed on a habeas petitioner asserting prosecutorial misconduct). Importantly, any alleged prosecutorial misconduct must be examined not in the abstract, but within the context in which it occurred. See Darden, 477 U.S. at 179 ("It is helpful as an initial matter to place these remarks in context."); see also Blissett v. LeFevre, 924 F.2d 434, 440 (2d Cir. 1991). "The severity of the

misconduct, curative measures, and the certainty of conviction absent the misconduct are all relevant to the inquiry." Blissett, 924 F.2d at 440; Newton, 369 F.3d at 680 (citing United States v. Elias, 285 F.3d 183, 190 (2d Cir. 2000)); see also Greer v. Miller, 483 U.S. 756, 766-67 & n.8 (1987) (discussing presumption that jury will follow curative instructions). As discussed below, none of the instances of alleged misconduct, either alone or cumulatively, deprived petitioner of a fundamentally fair trial, as the prosecutor's conduct either was proper or, if not, was adequately addressed through the trial court's remedial action; furthermore, there was substantial evidence establishing petitioner's guilt. Accordingly, the Appellate Division's rejection of petitioner's claims of prosecutorial misconduct was neither contrary to, nor an unreasonable application of, controlling Supreme Court precedent.

### A. The Prosecutor's Comments Concerning the Redacted Evidence

On direct examination of Ms. Xu, the prosecutor elicited testimony that her recitation of Yang's telephone number had been erased from the tape recording of her 911 telephone call to the police, which the prosecution was offering into evidence. (T. 547-49, 551.) When petitioner's attorney objected to entering the tape because "[t]here is a deletion that the district attorney made for whatever purpose," the prosecutor replied, "He knows what purpose." (T. 552.) Petitioner's attorney pressed the point, asserting that "I don't know what was deleted, . . . the jury doesn't know what was deleted. I assume the entire tape exists somewhere." (T. 552.) The prosecutor replied: "Her phone number was deleted so that the defendants wouldn't have it." (T. 552.) The trial judge denied the defense motion for a mistrial, but noted that "[t]he district

attorney's statement . . . was highly improper," and directed the jury to "disregard the colloquy of counsel." (T. 553; <u>see</u> T. 564-65.)

In light of the trial court's prompt remedial action, it cannot be said that the prosecutor's comment had a substantial and injurious effect on the verdict. <u>See</u> <u>Galdamez v. Keane</u>, 394 F.3d 68, 78 (2d Cir. 2005) ("[Despite] the prosecutor's indirect use of hearsay in posing a question, . . . the trial court judge's curative instruction to the jury alleviated any potential error . . . ."); <u>United States v. Forlorma</u>, 94 F.3d 91, 95 (2d Cir. 1996) ("Generally, we would not reverse a criminal conviction merely because a prosecutor made an unsupported statement in argument – especially where the trial judge sustained the defendant's objections to it."). Furthermore, the prosecutor's comment was prompted by defense counsel's persistence and implied accusation of misconduct.[15] <u>See</u> <u>McEachin v. Ross</u>, 951 F.Supp. 478, 482 (S.D.N.Y. 1997) ("Where a prosecution comment is a rejoinder to defense counsel's comments, that factor ameliorates the effect of an objectionable prosecution comment upon the fairness of a trial."); <u>cf.</u> <u>Darden</u>, 477 U.S. at 182 (prosecutor's comments did not deprive petitioner of a fair trial where "[m]uch of the objectionable content was invited by or was responsive to the opening summation of the defense"); <u>United States v. Tutino</u>, 883 F.2d 1125, 1136 (2d Cir. 1989). Accordingly, under these circumstances,

---

[15] The judge noted that he found "the statements of both counsel to be somewhat improper, ascribing bad motives to each other." (T. 552; <u>see</u> T. 565.)

the prosecutor's comment can hardly be said to have deprived petitioner of his right to a fair trial.[16]

### B.     Reference to Defendants As Criminals

Petitioner further complains that he was unfairly prejudiced by the prosecutor's characterization of him and his co-defendants as "criminals." See Pet. Supp. Mem. at 8, 16-17. Petitioner fails to note that the prosecutor's remark was prompted by a comment from counsel for petitioner's son, who argued in summation that "what happened to Mr. Fu, as unfortunate and as sad as it may be, is not criminal." (T. 1468.)[17] In response, the prosecutor noted that where the perpetrators failed to check their victim's condition, "you call those people criminals . . . who committed multiple acts of assault [in] what can only be characterized as . . . an unjustified and vicious way." (T. 1506.)

The trial court rightly overruled a defense objection, (T. 1506), as the challenged remark was a fair comment on the evidence and invited by the defense arguments. See cases cited *supra* p. 26.

---

[16]   In a similar vein, petitioner further contends, without identifying the relevant portion of the trial record, that the prosecutor "elicited testimony from another witness that the reason he lied to police about the number of individuals who assaulted him was because he feared retaliation by the defendant if the police became involved." Petition at 6. Petitioner apparently is referring to testimony elicited on *cross-examination* of victim Fu, who initially provided a different account of the assault to the police because he was "still afraid" and did not want "to escalate the whole incident." (T. 780-81.) Petitioner's contention that it was the prosecutor who elicited this testimony is belied by the record.

[17]   In addition, petitioner's counsel, in his summation, argued that "being drunk is not a crime" and that Shi's "act[ing] like a jerk . . . doesn't mean he is a criminal." (T. 1428-29.)

### C. Denigration of Defense Counsel

On summation, the prosecutor argued, over repeated objections from defense counsel, that they "took bits and pieces of the full body of evidence and used them to make specific arguments, sometimes in contradiction and sometimes not, to attempt to divert your attention . . . from the full body of evidence." (T. 1502, 1504-05.) The judge denied defense counsels' applications for a mistrial and a curative instruction. (T. 1502-05.)

Petitioner's claim that this comment denigrated the role of defense counsel is without merit. As the trial judge noted, this statement was a fair comment on the defense summations, merely emphasizing that the prosecution and defense sought to have the jury draw different conclusions from the evidence presented. (T. 1503-04.) See Garcia v. Greiner, No. 01-CV-2470 (JG), 2004 WL 943902, at *7 (E.D.N.Y. Apr. 28, 2004) ("The prosecutor can properly ask the jury not to be side-tracked by certain evidence and certain issues [and] to focus on the issues that make out the prosecution's case."). Furthermore, even if improper, this relatively mild comment was not sufficiently egregious to have deprived petitioner of a fair trial.[18] See United States v. Resto, 824 F.2d 210, 212 (2d Cir. 1987) (holding that prosecutor's remarks that defense counsel had engaged in "sleight-of-hand" and tried to pull the wool over the jury's eyes were not "so egregious as to warrant reversal"); see also Murray v. Greene, No. 06-

---

[18] The remark was far more innocuous than that of co-defendant Wang's counsel, who, on summation, accused the prosecutor of "trying to paint [Wang] as some sort of rabid Chihuahua." (T. 1456.)

CV-3677 (AJP), 2006 WL 3751294, at *17 n.36 (S.D.N.Y. Dec. 21, 2006); Toro v.

Herbert, Nos. 01-CV-3386 & 03-MISC-0066 (JBW), 2003 WL 22992059, at *5-6

(E.D.N.Y. Sept. 29, 2003) (Weinstein, J.); cf. United States v. Biasucci, 786 F.2d 504,

513-14 & n.9 (2d Cir. 1986) (affirming convictions despite prosecutor's references to

defense counsel as "sleaze" and "unlearned in the law," which, although improper,

"were inconsequential, isolated aberrations in a lengthy trial").[19]

### D. Vouching for the Credibility of the Prosecution's Witnesses

The prosecutor also argued in his closing statement that minor inconsistencies

between the accounts of different prosecution witnesses enhanced, rather than

undermined, the credibility of those witnesses and that therefore, "you can rely on their

testimony." (T. 1516.) The judge sustained an objection to this comment and instructed

the jury to "disregard the district attorney's implied vouching for his witnesses." (T.

1516-17.) The court subsequently directed to jury to ignore the prosecutor's personal

opinion as to a witness' veracity, (T. 1531), and reiterated that "neither the prosecutor

---

[19] Petitioner mistakenly relies upon the decision in United States v. Friedman, 909 F.2d 705 (2d Cir. 1990), see Pet. Supp. Mem. at 19, where, among other things, the prosecutor stated to the jury that "while some people . . . go out and investigate drug dealers and prosecute drug dealers and try to see them brought to justice, there are others who defend them, try to get them off, perhaps even for high fees." Friedman, 909 F.2d at 708. On appeal from the resulting conviction, the government confessed error. Id. at 709 & n.2. In ordering a new trial, the Second Circuit explained that "the prosecutor managed in one breath to undermine the presumption of innocence, the Government's obligation to prove guilt beyond a reasonable doubt, and the standards of propriety applicable to public prosecutors." Id. at 709. The remarks at issue in the instant case bear no resemblance to those in Friedman, which, moreover, did not implicate deferential AEDPA review.

nor any defense attorney is permitted under the law to tell you his opinion of what is true or not." (T. 1537.)[20]

The prosecutor's argument did not constitute impermissible vouching, but instead merely sought to rehabilitate Fu in response to defense counsels' repeated attacks on the credibility of the victim's testimony.[21] See Garcia, 2004 WL 943902, at *8; Robinson v. Superintendent of Southport Corr. Facility, Nos. 02-CV-3650 & 03-MISC-0066 (JBW), 2003 WL 22956946, at *21 (E.D.N.Y. Oct. 22, 2003) (Weinstein, J.) ("Arguments asking a jury to find, based on other evidence, that a witness testified truthfully [are] not improper vouching.") (citing United States v. Walker, 155 F.3d 180 (3d Cir. 1998)). Furthermore, even if improper, the comment did not deprive petitioner of his right to due process, especially given the trial court's prompt curative instructions. See Darden, 477 U.S. at 180-82; Blissett, 924 F.2d at 440.

### E.    Commenting on the Credibility of Yu Feng's Testimony

Finally, in discussing co-defendant Yu Feng's testimony that victim Fu intentionally slammed the door on Mrs. Shi's hand, the prosecutor stated that "I don't believe you can credit his testimony because I don't believe him that it was truthful [sic]." (T. 1531.) In response to a defense objection, the judge immediately instructed

---

[20] The latter instructions were prompted by a slip of the tongue by the prosecutor, discussed in the next subsection of this opinion.

[21] See T. 1431, 1485-87 (suggesting that the victim had had more to drink than he admitted to on the night in question and that he was an alcoholic); id. 1438, 1451-52, 1459 (noting that the victim had made a report to the police inconsistent with his trial testimony); id. 1487 (attacking the victim's credibility based on his demeanor on cross-examination).

the jury that "[c]ounsel's personal opinion as to the credibility of a witness . . . [i]s irrelevant and will be ignored." (T. 1531.) The judge denied a defense motion for a mistrial but issued a further curative instruction that "neither the prosecutor nor any defense attorney is permitted under the law to tell you his opinion of what is true or not, or to . . . vouch . . . for the testimony of any of his witnesses." (T. 1536-37.)

The propriety of the prosecutor's remark is not in question; in fact, at sidebar he conceded that he had misspoken. (T. 1534.) However, in light of the trial judge's immediate remedial response, it cannot be said that the prosecutor's comment had a "substantial and injurious" effect on the verdict in petitioner's case. See cases cited *supra* p. 23-26; United States v. Cruz, 797 F.2d 90, 93 n.1 (2d Cir. 1986) (prosecutor's "misstatement," to wit, that "[t]he defense . . . has to convince you," did not deprive defendant of a fair trial, where the court gave a curative instruction and the jury was properly charged as to the government's burden of proof); Miller v. Barkley, No. 03-CV-8580 (DLC), 2006 WL 298214, at *3 (S.D.N.Y. Feb. 8, 2006) (prosecutor's allegedly improper statement on summation did not entitle petitioner to habeas relief where trial court promptly instructed jurors to disregard it). Furthermore, as the trial judge noted, when viewed in context, the prosecutor's statement "might be regarded as a reaction to similar vouching as to truth[fulness] by" counsel for co-defendant Yu Feng. (T. 1535.) See Darden, 477 U.S. at 182. In short, none of the challenged comments by the prosecutor deprived petitioner of a fair trial.

## IV.     Ineffective Assistance of Counsel

Petitioner cites two bases upon which his trial counsel is alleged to have rendered

ineffective assistance. Specifically, petitioner asserts that defense counsel Richard Spivack was ineffective in (1) failing to conduct appropriate factual investigations, and thus overlooking witnesses with exculpatory information; and (2) failing to communicate trial strategies, plea offers and other "important information" to petitioner. Petition at 6; <u>see</u> Pet. Supp. Mem. at 23. Petitioner further complains that the state court denied his application without ordering an evidentiary hearing, and he urges this Court to either grant the writ or conduct an evidentiary hearing. <u>See</u> Pet. Supp. Mem. at 20-22, 28-30.

As a preliminary matter, petitioner's challenge to the state court's interpretation of CPLR requirements is not cognizable here, as a "complaint about compliance with state law lacks the necessary constitutional predicate for habeas corpus review." <u>Turner v. Sullivan</u>, 661 F.Supp. at 540 (McLaughlin, J.). Thus, "the failure to hold a hearing [under N.Y. Criminal. Proc. Law § 440.10] is not an independent ground for habeas relief." <u>Furzia v. Lewin</u>, No. 05-CV-0773 (SJF), 2006 WL 1229080, at *4 (E.D.N.Y. May 5, 2006); <u>see</u> <u>Jones v. Duncan</u>, 162 F.Supp.2d 204, 219 (S.D.N.Y. 2001) ("[Petitioner's] assertion that the failure to hold a hearing on his CPL §§ 440.10 and 330.30 newly discovered evidence motions violated due process is not cognizable on federal habeas review."). Rather, this Court must determine whether the state court acted contrary to or unreasonably applied federal law in denying petitioner's motion without a hearing.

The Supreme Court has recently addressed the circumstances under which a habeas petitioner is entitled to an evidentiary hearing. <u>See</u> <u>Landrigan</u>, 127 S.Ct. at 1940. There the Supreme Court concluded that the petitioner (who had been sentenced

to death) was not entitled to an evidentiary hearing regarding his trial counsel's alleged

ineffectiveness and failure to call witnesses at the penalty phase of the petitioner's trial.

As the Supreme Court explained:

> In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petitioner's factual allegations, which, if true, would entitle the applicant to federal habeas relief. Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate.
>
> It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.

Id. at 1940 (internal citations omitted).

For the reasons detailed below, petitioner has not established that the state court

acted contrary to or unreasonably applied federal law in rejecting both aspects of

petitioner's claim of ineffective assistance of counsel, and "even with the benefit of an

evidentiary hearing, [petitioner] could not develop a factual record that would entitle him

to habeas relief." Id.[22]

---

[22] Respondent contends that, for various reasons, petitioner's ineffective assistance of counsel claims are procedurally barred (see DA Mem. at 49-55; DA Supp. Mem. at 12-15) – an argument addressed at length in petitioner's supplemental submission. See Pet. Supp. Mem. at 24-27. The state court found petitioner's claims either procedurally barred or without merit. See 440.10 Opinion at 11. Because this Court concludes that petitioner's claims are without merit, it need not address the procedural issue. See Newton v. Coombe, No. 95-CV-9437 (GEL), 2001 WL 799846, at *4 n.2 (S.D.N.Y. July 13, 2001) ("I prefer to deal with meritless habeas claims on the merits whenever possible, to avoid any impression that prisoners with potentially meritorious claims are being deprived of their liberty based on procedural

(continued...)

Pursuant to the Supreme Court's decision in Strickland v. Washington, 466 U.S. 668 (1984), a criminal defendant asserting a claim of ineffectiveness must demonstrate (1) that his attorney's performance was deficient, and (2) that counsel's deficient performance prejudiced his defense. See id. at 687. To satisfy the performance prong, the accused must establish that his counsel's representation fell below an objective standard of reasonableness, measured by prevailing professional norms. See id. at 687-88. To establish prejudice, the accused must show that a reasonable probability exists that, but for counsel's unprofessional performance, the outcome of the proceeding would have been different. See id. at 694; see also United States v. Campbell, 300 F.3d 202, 214 (2d Cir. 2002) (noting that both prongs of Strickland test must be satisfied). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

These prerequisites are particularly onerous in a habeas proceeding, inasmuch as "it is the habeas applicant's burden to show that the state court applied Strickland to the facts of his case in an objectively unreasonable manner." Woodford v. Visciotti, 537 U.S. 19, 25 (2002). In other words, "it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly." Bell, 535 U.S. at 699; accord Visciotti, 537 U.S. at 24-25. Rather, the habeas petitioner must demonstrate that the state court's "application of Strickland was not merely incorrect, but objectively unreasonable[, which] involves some increment of

---

[22](...continued)
technicalities.").

incorrectness beyond error." Hemstreet v. Greiner, No. 02-2747-pr, 2007 U.S. App. LEXIS 14452, at *12-13 (2d Cir. June 20, 2007) (internal citations, quotation marks and brackets omitted).

Furthermore, it is well settled that not every error or mistake made by counsel will constitute ineffective assistance. See Morris v. Garvin, No. 98-CV-4661 (JG), 2000 WL 1692845, at *3 (E.D.N.Y. Oct. 10, 2000) ("Just as criminal defendants are not entitled to a perfect trial, only a fair one, they are not entitled to error-free, perfect representation."). The Supreme Court has directed courts to consider "the totality of the evidence before the judge or jury," Strickland, 466 U.S. at 695, and thus any errors by counsel "must be considered in the aggregate, rather than in isolation." Curry v. Burge, No. 03-CV-0901 (LAK/AJP), 2004 WL 2601681, at *26 (S.D.N.Y. Nov. 17, 2004) (internal quotation marks omitted); see Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001). In weighing a *Strickland* challenge, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689; accord United States v. Aguirre, 912 F.2d 555, 560 (2d Cir. 1990). Finally, as with all habeas challenges, the state court's factual findings are presumptively correct and may not be disturbed unless rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).

Having reviewed the trial transcript, this Court concurs with respondent's and the state court's assessments as to the quality of the representation that Spivack afforded petitioner. See DA Supp. Mem. at 16-27; 440.10 Opinion at 8 n.4. Spivack proceeded to trial with a coherent and plausible defense, which he vigorously pursued in his

selection of the jury, opening and closing statements, cross-examination and impeachment of the prosecution's various witnesses, motions and objections, and attempts to shape the charge to the jury. Simply put, he exhibited a solid understanding of the facts and the law and represented petitioner in a highly competent and professional manner.

Petitioner's complaints about Spivack's alleged omissions must be viewed in the context of counsel's overall performance, see Kimmelman v. Morrison, 477 U.S. 365, 386 (1986); accord Smith v. Artus, No. 06-CV-0178 (NG/SMG), 2007 WL 1350276, at *5 (E.D.N.Y. Mar. 7, 2007), which in this case far exceeded constitutional requirements.

## A.     Failure to Investigate

In his federal filings, as in his collateral challenge in state court, petitioner argues that Spivack's representation was constitutionally defective because he failed to conduct appropriate factual investigations. See Petition at 6; Pet. Supp. Mem. at 29; Pet. 440.10 Mem. at 8-14. Specifically, petitioner contends that two eyewitnesses who were present at Yang's apartment – Chih Ming Wong ("Ming Wong") and Ding Xian Feng ("Xian Feng")[23] – would have testified that "Shi never hit Fu at all." Pet. 440.10 Mem. at 9-10; see Petition at 6. Petitioner further claims that one Hai Yan Yang ("Yan Yang")

---

[23] According to petitioner's state court submissions, Chih Ming Wong is the same person identified in Mrs. Shi's trial testimony (and in the Statement of Facts, *supra* as Zi Men Wong). See Affirmation [of Matthew Z. Earle] in Response, dated 8/5/2005 ("Pet. 440.10 Resp.") at 8. Petitioner further suggests that Xian Feng was the honoree of petitioner's going-away party. Id. at 8-9.

would have given evidence of a "plot to punish Shi's friends and family [that] would have placed inconsistent testimony by the People's witnesses in a different context." Pet. 440.10 Mem. at 15; see also Petition at 6.

### 1. Spivack's Failure to Interview Two Eyewitnesses

#### a. Relevant Facts

In separate affidavits, Ming Wong and Xian Feng alleged that on the night of February 14, 2001, they drove with Mrs. Shi to Yang's apartment, and the two men went inside while she waited in the car. See Affidavit [of Chih Ming Wong] in Support of Motion to Vacate ("Ming Wong Aff.") ¶¶ 9-11; Affidavit [of Ding Xian Feng] in Support of Motion to Vacate ("Xian Feng Aff.") ¶¶ 15-16. Ming Wong went to one of the bedrooms, where he saw Yang and Dr. Ye trying to calm petitioner down, while Xian Feng waited in the living room. Ming Wong Aff. ¶¶ 11-13; Xian Feng Aff. ¶¶ 17-18. Sometime later, Mrs. Shi, who was trying to enter the apartment, screamed in pain (Xian Feng Aff. ¶¶ 23-24; see also Ming Wong Aff. ¶ 15), whereupon petitioner's son (co-defendant Yu Feng) began assaulting victim Fu. Xian Feng Aff. ¶ 25. Persons present in the apartment separated Yu Feng and Fu. Ming Wong Aff. ¶ 17; Xian Feng Aff. ¶ 27. Yang then brought Fu into the kitchen while petitioner, who had emerged from the bedroom, was held back by Ming Wong and others. Ming Wong Aff. ¶¶ 18-19; Xian Feng Aff. ¶¶ 28-30. Neither affiant saw petitioner strike Fu, and neither was interviewed or contacted by Spivack. Ming Wong Aff. ¶¶ 21-22; Xian Feng ¶¶ 32, 34.

In response to petitioner's 440.10 application, the prosecution submitted an affirmation from Spivack ("Spivack Aff."),[24] along with handwritten notes from his initial interview of Shi ("Spivack Notes").[25]  Petitioner told Spivack (through an interpreter) that he had been drunk at the time of the incident and thus did not have a good memory of the events.  Spivack Aff. ¶ 9.  Petitioner additionally stated that he had not witnessed the initial attack on Fu and, apart from Yang and Fu, "was unaware that anyone was present other than his son or wife."  Id. ¶ 10.

Spivack also spoke with Mrs. Shi, who was not inside Yang's apartment when the assault occurred and thus could not tell him who was there.  Id. ¶ 12.  Mrs. Shi advised Spivack that she had been driven to the apartment by an individual who had later returned to China and whose name she could not recall.  Id.  Spivack had no recollection or notes of any suggestion by petitioner or his wife that a Chih Ming Wong or Ding Xian Feng was in the apartment at the time of the assault.  Id. ¶ 11.

Based on Spivack's conversations with petitioner and his wife, as well as his review of the police reports and consultation with counsel for the co-defendants, Spivack concluded that the best strategy for defending petitioner was to emphasize that petitioner was not present during the initial assault and to demonstrate that petitioner did not share the requisite intent to cause Fu serious physical injury.  Id. ¶ 13.

Though faced with his trial counsel's affirmation to the state court judge,

---

[24]  The Spivack Affirmation is attached as Exhibit B to Respondent's Affirmation in Opposition to Defendant's Motion to Vacate Judgment Pursuant to C.P.L. § 440.10 ("Resp. 440.10 Aff.").

[25]  The notes are reproduced as Exhibit C to Resp. 440.10 Aff.

petitioner opted not to submit his own sworn statement to challenge Spivack's version of events, nor did he offer an affidavit from Mrs. Shi.  Instead, in reply papers filed in connection with his 440.10 motion, petitioner sought to establish circumstantially that Spivack was aware that Ming Wong and Xian Feng were eyewitnesses to the attack and that they could provide exculpatory testimony.  See generally Pet. 440.10 Resp.  First, petitioner pointed to Spivack's notes, see id. at 8-9, which reflect that two individuals named "Wang Zhe Ming" and "Fung Ting She" were present at the *restaurant before* the assault and at the latter's *hotel room after* the assault.  See Spivack Notes at first and fourth pages.[26]  A substantial portion of petitioner's 440.10 reply papers thus consisted of his attempt to establish, through a detailed analysis of Chinese dialects and methods of transliteration, that "Wang Zhe Ming" and "Fung Ting She" could also signify Chih Ming Wong and Ding Xian Feng, the two affiants who belatedly supplied the alleged eyewitness accounts underlying petitioner's claim of ineffectiveness.[27]

The state court denied petitioner's motion to vacate his judgment of conviction. First the court reviewed Spivack's overall performance at trial and found that counsel

---

[26]  The notes also indicate that one friend was going "back to China" and that the gathering at the restaurant was a "farewell for Fung Ting She."  Spivack Notes at first page.

[27]  Petitioner appended two documents from native Mandarin Chinese speakers: an affirmation from Dawei Gongsun, an attorney, and an affidavit from Liyi Tao, whose credentials are not identified.  See Affirmation [of Dawei Gongsun], dated 8/4/2005; Affidavit of Liyi Tao, dated 8/4/2005.  Although both documents propose a number of alternative transliterations of the same Chinese characters that allegedly represent the names of the two affiants at issue, neither asserted that Wang Zhe Ming and Chih Ming Wong were the same person, nor that Fung Ting She and Ding Xian Feng were the same person.  Petitioner also relied upon several lengthy printouts from internet websites (including Wikipedia) concerning Chinese dialects and methods of transliteration.  See Pet. 440.10 Resp. Exs. A–E.

had pursued a "well planned strategy" in an effective manner. See 440.10 Opinion at 8

n.4.[28] The court credited Spivack's unrefuted sworn statement that neither petitioner nor

his wife had advised him that Chih Ming Wong and/or Ding Xian Feng were in the

apartment at the time of the assault. See id. at 9-10. Having considered petitioner's

evidentiary submissions and arguments, the state judge found that Spivack had no reason

to believe that the two friends referenced in his notes – Wang Zhe Ming and Fung Ting

She – were the same individuals as the affiants, or that they had any exculpatory

information about the assault; moreover, the court concluded, Spivack had been

provided with no contact information concerning those individuals. See id. In these

---

[28] The court specifically held:

> Upon this Court's review of trial counsel's representation of defendant, counsel advanced reasonable strategies including a defense of justification. Counsel adequately addressed relevant trial issues with prospective jurors during jury selection. He argued the "intent" element necessary to commit the crime, as well as[] the burden of proof required to sustain a conviction. Furthermore, counsel argued that the incident which occurred in the apartment was as a result of defendant's wife's fingers getting caught in the apartment door and not because there was an incident between defendant and the complainant's group of friends at the restaurant earlier. Additionally, a review of defense counsel's cross-examination of the People's witnesses was cohesive and reveals that he effectively utilized his cross-examination to support his trial strategy. He further established defendant's absence from the room when the assault began. Moreover, counsel established upon cross-examination of the doctor[] that the type of blow defendant was . . . accused of advancing upon the victim[] would not have resulted in the injuries sustained. Counsel impeached the credibility of witnesses through the use of prior testimony and appropriately requested jury charges. Upon a review of defense counsel's affirmation, . . . it is clear that he advanced a well planned strategy and utilized it at trial.

440.10 Opinion at 8 n.4.

circumstances, "defendant has not met his burden of demonstrating that counsel's performance was inadequate" in having failed to interview the affiants. Id. at 10.[29]

### b.    *Legal Analysis*

As an initial matter, petitioner's challenge assumes, without more, that Spivack knew or should have known that Ming Wong and Xian Feng were eyewitnesses to the attack on Fu. However, the state court understandably rejected that suggestion, which is premised on a series of inferences that do not find support in Spivack's notes or the record as a whole. See 440.10 Opinion at 9-10 ("[E]ven if the name or names of these individuals are in counsel's notes, defendant has not met his burden of demonstrating that counsel's performance was inadequate because there is no indication . . . that he advised counsel that these individuals would say that he never struck the complainant.").[30] The state court's finding that Spivack had no reason to believe that the individuals referenced in his notes could provide exculpatory evidence is presumptively correct and has not been rebutted by clear and convincing evidence. See 28 U.S.C. §

---

[29] Petitioner faults the state court for citing petitioner's failure to submit his own affidavit as one of the reasons for denying the motion to vacate; petitioner contends that "[t]here is no statutory requirement that the defendant himself submit an Affidavit" and that "[t]he papers submitted by Petitioner in fact do satisfy the requirements of" N.Y. Crim. Proc. Law § 440.30(4)(b). Pet. Supp. Mem. at 22. Petitioner's argument misses the mark. Whether or not statutorily required, the absence of an affidavit on personal knowledge is a factor that a court may consider in determining whether the movant has sustained his burden.

[30] Even assuming that the two friends referenced in Spivack's notes were the same persons as the two affiants, the notes reflect only that they were present at the restaurant and then at a hotel room later that night. See Spivack Notes at first, third and fourth pages; see also Pet. 440.10 Resp. at 20 (observing that the notes indicate that the two affiants "were around for dinner and . . . at the end of the night when they went back to . . . Feng's hotel").

2254(e)(1); Rice v. Collins, 546 U.S. 333, ___, 126 S.Ct. 969, 974 (2006); Leka v. Portuondo, 257 F.3d 89, 98 (2d Cir. 2001) ("[A] determination of fact made by a state court [in a 440.10 opinion] is presumed correct.").

Nor has petitioner demonstrated that Spivack's failure to interview the eyewitness affiants constituted an error of such severity that Spivack "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. An ineffectiveness claim based on counsel's failure to investigate "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 691; see also Berger v. Raciti, 05-CV-1001 (NGG), 2006 WL 1154820, at *6 (E.D.N.Y. May 1, 2006). Although in some cases a reasonable investigation will require defense counsel to "speak before trial with readily-available fact witnesses whose non-cumulative testimony would directly corroborate the defense's theory of important disputes," Pavel v. Hollins, 261 F.3d 210, 221 (2d Cir. 2001), a decision not to pursue an investigation may not be challenged as unreasonable "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless." Strickland, 466 U.S. at 691. In other words, the duty to investigate "does not . . . compel defense counsel to investigate comprehensively every lead or possible defense . . . or 'to scour the globe on the off-chance something will turn up.'" Greiner v. Wells, 417 F.3d 305, 321 (2d Cir. 2005) (quoting Rompilla v. Beard, 545 U.S. 374, 383 (2005)). To the extent that counsel determines that additional investigation "would be fruitless or even harmful, counsel's

failure to pursue those investigations may not later be challenged as unreasonable." Id. at 321 (quoting Strickland, 466 U.S. at 691).

At no time has petitioner offered any evidence to refute Spivack's assertion that neither petitioner nor his wife told him that the eyewitness affiants were in the apartment at the time of the assault. See Spivack Aff. ¶ 11.[31] Nor has petitioner proffered any proof that the affiants were readily available prior to trial.[32] Spivack could reasonably have concluded that such an investigation would have been fruitless and indeed a waste of valuable time and resources. See Greiner, 417 F.3d at 320-21, 326 (reversing grant

---

[31] Petitioner's reply papers in state court instead contained a detailed analysis of the trial transcript, seeking to establish retrospectively that the eyewitness affiants were the two men in their forties who, according to the prosecution's witnesses, accompanied Shi when he entered Yang's apartment. See Pet. 440.10 Resp. at 14-20. However, none of the witnesses identified petitioner's middle-aged companions; indeed, petitioner's son, who testified as a defense witness, made no mention whatsoever of these two eyewitnesses. (See generally T. 1274-96.) Whatever the identities of the two middle-aged men, the record is barren of any proof that Spivack was made aware of their existence prior to trial; it thus appears that petitioner and his family either could not, or did not care to, impart any identifying information.

[32] Conspicuously absent from the record is any proof that Spivack had been provided with any contact information concerning the affiants. See 440.10 Opinion at 10. Indeed, Xian Feng expressly states in his affidavit that he is a resident of the People's Republic of China who was leaving for China the day after the party hosted by petitioner, and that he was in China during the trial. Xian Feng Aff. ¶¶ 2-4, 35. Curiously, Ming Wong's affidavit is silent as to his residence or whereabouts and why he failed to come forward until years after petitioner was convicted. Not surprisingly, courts generally are loathe to credit exculpatory affidavits presented long after trial. See generally Schlup v. Delo, 513 U.S. 298, 332 (1995) (stating that in reviewing a claim of newly discovered evidence, "the court may consider . . . the timing of the submission" as bearing on its reliability); Herrera v. Collins, 506 U.S. 390, 418-19 (1993) (noting that affidavits received long after trial are viewed as suspect); id. at 423-24 (O'Connor, J., and Kennedy, J., concurring) ("Experience has shown . . . that [exculpatory] affidavits [produced long after trial] are to be treated with a fair degree of skepticism.").

of writ).  Accordingly, the state court did not act unreasonably in determining that

Spivack's failure to interview Ming Wong or Xian Feng did not render Spivack's

performance constitutionally deficient.[33]

In any event, petitioner has not, as a matter of law, established prejudice under

the second prong of *Strickland*.  "Unlike the determination of trial counsel's

performance under the first prong of *Strickland*, the determination of prejudice may be

made with the benefit of hindsight."  Hemstreet, 2007 U.S. App. LEXIS 14452, at *18

(citation and internal quotation marks omitted).  Even if Ming Wong and Xian Feng had

testified at trial, there is no reasonable possibility that the proceedings would have had a

different result.  Although both of these eyewitnesses state in their affidavits that they

did not see petitioner strike the victim, they do not swear definitively that petitioner did

not do so.  Indeed, given the commotion occurring in the room at the time of the attack,

it is distinctly probable that neither of them was watching petitioner closely during the

entire altercation.  Additionally, the testimony of the two affiants would have

significantly increased the number of inconsistencies in the accounts of the various

---

[33] Petitioner's reliance on Pavel v. Hollins, 261 F.3d 210, is misplaced.  See Pet. Supp. Mem.
at 25.  In Pavel, the defendant was charged with sexually abusing his two young sons.  261
F.3d at 211.  The defense attorney – who represented the defendant in connection with his
child custody and other marital disputes – had prepared no defense whatsoever to the criminal
charges.  See id.  As he explained in an affidavit submitted in connection with Pavel's habeas
petition: "I did not prepare a defense for Mr. Pavel, believing instead that a motion to dismiss
the State's case at the close of its evidence in chief would be granted by the Court."  Id. at 212
n.2.  Spivack's failure to call the then unidentified witnesses is a far cry from counsel's many
derelictions in Pavel.  And the Lindstadt case cited by petitioner likewise involved the
"cumulative effect" of four egregious errors by counsel, not simply the failure to call several
witnesses.  See Lindstadt, 239 F.3d at 194.

defense witnesses,[34] and thus would have undercut a defense criticism of the prosecution's evidence. (See, e.g., T. 1449.) See Hemstreet, 2007 U.S. App. LEXIS 14452, at *18-19 (holding no prejudice established where the testimony of the uncalled witness "would have contradicted the sequence of events on the night of the murder established by three other witnesses, as well as by [petitioner] himself"). Furthermore, inasmuch as the three prosecution eyewitnesses testified that they observed petitioner hit Fu, and Yang testified that petitioner called to apologize for having punched Fu, there is no reasonable probability that the testimony of the eyewitness affiants would have altered the verdict in petitioner's case. See id. at *21-22 ("In light of this evidence, we are not prepared to conclude there was a reasonable likelihood that the testimony of a witness of questionable veracity, who, at best, would have offered a version of events that was inconsistent with that established by multiple other witnesses, would have changed the outcome of the trial."); cf. United States v. Schmidt, 105 F.3d 82, 90 (2d Cir. 1997) (finding that while additional defense testimony "might have been helpful," prejudice was not established where "the jury would necessarily have weighed it against the government's strong proof," and thus appellant failed to establish that it was "reasonably

---

[34] For example, Ming Wong alleges in his affidavit that he was in the bedroom with petitioner, Yang and Dr. Ye when co-defendant Yu Feng entered that room. Ming Wong Aff. ¶¶ 11-14. The trial testimony of petitioner's son does not, however, place any companion of his father's in that room. (See T. 1279-80.) In addition, both affiants claim to have driven with Mrs. Shi to Yang's apartment. See Xian Feng Aff. ¶ 15, Ming Wong Aff. ¶ 9. Mrs. Shi, in contrast, testified that "Men Wong" drove her to Yang's home. (T. 1191-93.) Furthermore, Xian Feng's affidavit implies that Yang and petitioner left Yang's bedroom at about the same time and that, in contrast to Ming Wong's affidavit, petitioner would have witnessed part of his son's assault on Fu. See Xian Feng Aff. ¶¶ 26-27; Ming Wong Aff. ¶ 17.

likely the jury would have reached a different result").

### 2. Spivack's Failure to Interview Yan Yang

Petitioner also faults Spivack for not interviewing and offering testimony from Hai Yan Yang ("Yan Yang"), Yang's cousin and a "close friend" of Mrs. Shi. Petition at 6; Affidavit [of Hai Yan Yang] in Support of Motion to Vacate ("Yan Yang Aff.") ¶¶ 1-2. In her affidavit, Yan Yang stated that she went to the apartment where the assault occurred after receiving a call from Mrs. Shi later that night. Yan Yang Aff. at ¶¶ 2-4. Arriving after petitioner and his group had left, she allegedly saw unidentified people arranging the living room to appear as though a "fierce fight" had taken place and thus to "stage[] the scene" prior to calling the police. Id. at ¶¶ 4-6. Yan Yang further stated, "[u]pon information," that victim Fu was trying to "blackmail" petitioner's family by asking for $100,000 to prevent Fu from bringing a suit against them. Id. at ¶ 10. Spivack never contacted her to discuss the incident or called her to testify at trial. Id. at ¶ 8.

In his collateral challenge in state court, petitioner argued that Yan Yang's evidence "would have placed inconsistent testimony by the People's witnesses in a different context," and would have made Spivack's cross-examination of the victim more effective. See Pet. 440.10 Mem. at 15-18.[35] The state judge disagreed, concluding that her testimony would have been inadmissible. See 440.10 Opinion at 10.

---

[35] At trial, Spivack cross-examined Fu as to whether he had sent a friend to ask petitioner for money in exchange for Fu's not prosecuting the case; Fu denied that he had done so. (T. 791-92.)

Petitioner's claim is without merit. Petitioner does not dispute Spivack's statement that no one informed him that Yan Yang had helpful information, <u>see</u> Spivack Aff. ¶ 11, nor does her name appear anywhere in Spivack's notes or even in the trial record. In short, Spivack had no reason whatsoever to believe that this person had any relevant information. Even if Spivack had been aware that Yan Yang possessed information regarding events that took place after the assault, he could reasonably have concluded that this evidence would not have assisted his case, as much of the information was based "[u]pon information" and not first-hand knowledge, and would have been inadmissible as hearsay. <u>See</u> 440.10 Opinion at 10; Yan Yang Aff. ¶ 10. Accordingly, Spivack's performance was not deficient as a result of his failure to interview Yan Yang.

Moreover, petitioner has not demonstrated that, had Spivack interviewed Yan Yang and called her to testify, there was a reasonable possibility that the proceedings would have had a different outcome. As noted above and by the state court judge, Yan Yang's blackmail accusation constituted inadmissible hearsay, and contained no information as to the identities of those with first-hand knowledge of the alleged scheme. Moreover, any impeachment of Fu on that basis would not have affected the credibility of any of the other three eyewitnesses who corroborated Fu's testimony. Finally, Yan Yang's allegation as to the staging of a violent fight does not name the persons supposedly involved in that scheme. Since it is undisputed that a violent fight occurred, it is unclear how such testimony would have affected the outcome of the case.

Accordingly, petitioner has not satisfied his burden under the prejudice prong of *Strickland*.

## B.      Failure to Communicate Trial Strategies and Plea Offers

Similarly meritless is petitioner's challenge to the state court's rejection of his claim that Spivack "failed to communicate trial strategies, plea offers, and important information." Petition at 6; see Pet. Supp. Mem. at 22-23. In support of this claim, petitioner argued in his 440.10 motion that Spivack (1) was present at only two pretrial defense meetings, and did not meet separately with petitioner; and (2) did not communicate any plea offers. Pet. 440.10 Mem. at 19-20. However, as discussed below, the record does not support either of these contentions.[36]

### 1.      Spivack's Pretrial Communications with Petitioner

Petitioner's argument that Spivack never met separately with Shi, never communicated any trial strategies, and attended only two joint defense meetings is flatly refuted by Spivack's sworn statement, which the state court fully credited. See 440.10 Opinion at 7. Spivack specifically recalled discussing with Shi the prosecution's case and possible trial strategies and defenses, including those that he pursued at trial; he thus

---

[36]  For the first time in his habeas petition, petitioner further complains that Spivack did not utilize a translator to communicate with him. See Petition at 6; see also Pet. Supp. Mem. at 27-28. This claim is unsupported by the record and indeed is contrary to Spivack's sworn statement. See Spivack Aff. ¶ 9. Moreover, as this claim was never presented in state court, it is unexhausted and may not form the basis for habeas relief. See 28 U.S.C. § 2254(b)(1)(A). A federal habeas court may, however, *deny* an unexhausted claim on the merits where, as here, the claim "clearly lacks merit." Hinds v. Fischer, No. 03-CV-0907 (JSR/FM), 2006 WL 1993249, at *8 (S.D.N.Y. June 30, 2006); see 28 U.S.C. § 2254(b)(2).

acted in conformity with his usual practice as a defense attorney to discuss trial strategy with his clients. Spivack Aff. ¶ 6. Spivack averred that he attended "numerous" joint defense meetings with his client, Shi's co-defendants and their attorneys, and met alone with Shi "either before or after" these joint meetings. Id. ¶¶ 7-8. Spivack took notes during his initial interview of Shi, at which an interpreter – and no one else – was present. Id. ¶ 9; see Spivack Notes.

In rejecting petitioner's challenge, the state court emphasized that petitioner had not supported his argument with his own sworn statement, but instead relied upon affidavits of family members with "limited" knowledge of the relevant facts. See 440.10 Opinion at 5; see also id. at 7 ("[Petitioner's] family was not present during all attorney-client conversations that counsel had with [petitioner] and therefore[] could not attest to these conversations.").[37] The trial court rejected as incredible, based on the evidence presented, petitioner's sons' contentions that counsel never discussed trial strategy. See id. These factual findings are presumed to be correct, and have not been rebutted by clear and convincing evidence. Consequently, petitioner established no deficiency in Spivack's pretrial communications with Shi.

Even assuming *arguendo* that petitioner satisfied the first prong of *Strickland*, he has failed to demonstrate that he was prejudiced by any deficiency in Spivack's communications. Spivack affirmed that, based on his conversations with petitioner and counsel for the co-defendants, as well as his review of police reports, he determined that the most viable defense was to emphasize (among other things) that petitioner was not

---

[37] See *supra* note 29.

49

present during the initial attack, and, at worst, struck the victim once, without the requisite intent to cause serious physical injury.  See Spivack Aff. ¶ 13.  Although this strategy proved to be unsuccessful with respect to most of the counts,[38] Spivack's decision to pursue this course of action did not render his performance unconstitutionally defective.  See *supra* pp. 35-36; Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994) ("In assessing the attorney's performance, a reviewing court must judge his conduct on the basis of the facts of the particular case, viewed as of the time of counsel's conduct, and may not use hindsight to second-guess his strategy choices.") (citing Strickland, 466 U.S. at 690, and Lockhart v. Fretwell, 506 U.S. 364, 372 (1993)) (internal quotation marks omitted).[39]  Petitioner has not shown that he had any valuable information that he would have imparted had Spivack spent more time conferring with him.[40]  Petitioner thus has not demonstrated that he was prejudiced by Spivack's alleged lack of communication regarding trial strategy.

---

[38]  Petitioner was acquitted of the top charge.  See *supra* note 8.

[39]  Ironically, while ridiculing Spivack's trial strategy as "specious" and predicated on "splitting hairs" (Pet. 440.10 Mem. at 9), petitioner has, in every post-conviction proceeding (including his habeas petition and supplemental memorandum), pressed those same defenses as the bases for overturning his conviction.

[40]  Petitioner argued, in his state court brief, that he "had no idea what his attorney was going to argue at trial" and, had he known, "he would have insisted" that they put on an "actual innocence" defense through the testimony of the two eyewitness affiants.  Pet. 440.10 Mem. at 20.  As petitioner opted not to submit his own affidavit concerning his communications or lack of communications with Spivack, the state judge did not act unreasonably in disregarding petitioner's unsworn assertions.  Moreover, for the reasons previously discussed, see *supra* pp. 44-46, petitioner has not established a reasonable probability that an "actual innocence" defense would have resulted in his acquittal.

## 2.    The Plea Offer

In his final challenge to Spivack's effectiveness, petitioner contends that Assistant District Attorney ("ADA") Sean Clark made a pretrial plea offer to Spivack that was not communicated to petitioner.  See Petition at 6; Pet. Supp. Mem. at 22-23.  It is well settled that a defense attorney is required to inform the accused of the terms of any plea offer made by the prosecution.  See, e.g., Cullen v. United States, 194 F.3d 401, 404 (2d Cir. 1999).  Petitioner's challenge is not, however, supported by the record.  First of all, as the state judge reasonably concluded, the absence of a sworn statement from petitioner addressing this issue is reason enough to reject the claim as factually unsubstantiated.  See 440.10 Opinion at 5-6.

Moreover, the evidence adduced in state court flatly refutes petitioner's unsworn assertion.  See id. at 7.  Petitioner and Yu Feng were initially represented by attorney Todd Greenberg, who acted as counsel for the latter at trial.  See Affirmation [of Todd D. Greenberg in Support of Respondent's 440.10 Opposition] ("Greenberg Aff.") ¶¶ 4, 8; Affidavit [of Yu Feng Shi] in Support of Motion to Vacate ¶ 21.  ADA Clark acknowledged that prior to presenting the case to the grand jury, he had made Shi a plea offer of two years' incarceration, see Affirmation [of Shawn Clark, Esq. in Support of Respondent's 440.10 Opposition] ("Clark Aff.") ¶ 5, but, according to Greenberg, petitioner "adamantly denied his guilt . . . and advised that he would not plead guilty." Greenberg Aff. ¶ 6; see also Clark Aff. ¶ 6.  Spivack began to represent petitioner in or around August 2001, after the grand jury returned an indictment, at which point the District Attorney's Office made no further plea offers.  See Spivack Aff. ¶¶ 1, 5; Clark

Aff. ¶ 6. Thus, as there was no plea offer to communicate during Spivack's representation of petitioner, the failure to convey a plea offer did not render his assistance ineffective.

Even assuming that Spivack – or, for that matter, Greenberg – failed to communicate a plea offer, petitioner has not demonstrated any resulting prejudice. In order to demonstrate prejudice under *Strickland*, petitioner must prove that he would have accepted the offer that counsel allegedly failed to convey. See, e.g., Aeid v. Bennett, 296 F.3d 58, 63-64 (2d Cir. 2002); Purdy v. United States, 208 F.3d 41, 49 (2d Cir. 2000); cf. United States v. Gordon, 156 F.3d 376, 380-81 (2d Cir. 1998). Attorneys Spivack and Greenberg each affirmed that petitioner specifically indicated that he did not wish to plead guilty. See Spivack Aff. ¶ 5; Greenberg Aff. ¶ 6. Their assertions stand uncontradicted; at no time has petitioner offered his own sworn statement that he would have accepted *any* plea offer – let alone the one that purportedly was not conveyed to him. As petitioner has not demonstrated "a reasonable probability that but for [defense counsel's] deficiencies, [he] would have pled guilty," his ineffective assistance of counsel claim must fail. See Purdy, 208 F.3d at 49.

## CONCLUSION

For the foregoing reasons, it is the recommendation of this Court that Cheng Kang Shi's petition for a writ of habeas corpus be denied without a hearing and that the case be dismissed.

Any objections to the recommendations contained herein must be filed with the Honorable Nina Gershon on or before July 26, 2007. Failure to file objections in a

timely manner may waive a right to appeal the District Court order.  See 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; Small v. Sec'y of Health & Human Servs.,

892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to docket and serve this Report and Recommendation via

electronic case filing.

**SO ORDERED.**

**Dated:**      **Brooklyn, NY**
                **July 12, 2007**


                        **ROANNE L. MANN,**
                        **UNITED STATES MAGISTRATE JUDGE**